# United States Tax Court

T.C. Memo. 2022-100

DONALD FURRER AND RITA FURRER,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 7633-19.                    Filed September 28, 2022.

————

*Anita L. Steburg*, for petitioners.

*Kristin M. Bourland, Stephen A. Haller, Joline M. Wang*, and *Philip Edward Blondin*, for respondent.

## MEMORANDUM OPINION

LAUBER, *Judge*: Petitioners seek redetermination of deficiencies determined by the Internal Revenue Service (IRS or respondent) in connection with two charitable remainder annuity trusts (CRATs). Petitioners, who were engaged in the farming business, made in-kind transfers of agricultural crops to the CRATs in 2015 and 2016. The CRATs sold the crops and used the proceeds to purchase annuity plans. During 2015–2017 the annuity plans made cash distributions to petitioners. After concessions two questions remain for decision, which respondent has presented by Motion for Partial Summary Judgment: (1) whether petitioners are entitled under section 170[1] to noncash charitable contribution deductions for 2015 and 2016 for portions of the crops

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[*2] transferred to the CRATs; and (2) whether the annuity distributions were taxable to petitioners as ordinary income for 2015–2017. We resolve both questions in respondent's favor.

*Background*

There is no dispute as to the following facts, which are drawn from the parties' joint Stipulation of Facts, motion papers, and exhibits and declarations attached thereto. Petitioners resided in Indiana when they timely petitioned this Court.

During 2015–2017 petitioners were actively engaged in the farming business, growing and selling corn and soybeans. In July 2015, after seeing an advertisement in a farming magazine, petitioners formed the Donald & Rita Furrer Charitable Remainder Annuity Trust of 2015 (CRAT I), of which their son was named trustee. The trust instrument designated petitioners as life beneficiaries and three eligible section 501(c)(3) charities as remaindermen.

When forming CRAT I petitioners transferred to it 100,000 bushels of corn and 10,000 bushels of soybeans grown on their farm. In August 2015 CRAT I sold the crops for $469,003. The sales were effected by Co-Alliance LLP, a grain marketing and storage facility in Avon, Indiana, where petitioners stored the crops. CRAT I distributed $47,000 of the proceeds to the charitable remaindermen and used most of the balance to purchase a Single Premium Immediate Annuity (SPIA) from Symetra Life Insurance Co. (Symetra). The SPIA made annual annuity payments of $84,368 to petitioners in 2015–2017.

For each year Symetra issued to the trustee a Form 1099–R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc. These forms listed the annuity payments as "gross distributions" and showed a small amount of interest as the "taxable amount."

On January 13, 2016, petitioners created the Donald & Rita Furrer Charitable Remainder Annuity Trust of 2016 (CRAT II). Following the previous pattern, petitioners designated themselves as life beneficiaries, with the remainder going to seven eligible section 501(c)(3)

[*3] charities.  Petitioners funded CRAT II by transferring to it 111,335 bushels of corn and 31,064 bushels of soybeans grown on their farm.[2]

In April 2016 CRAT II sold the crops for $691,827.  The sales were again effected by Co-Alliance LLP, the grain marketing and storage facility where petitioners stored the crops.  CRAT II distributed $69,294 of the proceeds to the charitable remaindermen and used the balance to purchase another SPIA from Symetra.  This SPIA made annual annuity payments of $124,921 to petitioners in 2016 and 2017.  Symetra again issued a Form 1099–R to the trustee, listing the annuity payments as "gross distributions" and showing a small amount of interest as the "taxable amount."

Petitioners timely filed joint Federal income tax returns for 2015–2017.  They attached to each return a Schedule F, Profit or Loss From Farming, reporting farming income and expenses as follows:

|  | 2015 | 2016 | 2017 |
| --- | --- | --- | --- |
| Income | $1,050,571 | $294,595 | $159,797 |
| Expenses | (1,058,051) | (247,476) | (152,308) |
| **Total Profit/(Loss)** | **($7,480)** | **$47,119** | **$7,489** |

On their 2015 and 2016 returns petitioners claimed charitable contribution deductions for cash gifts but claimed no deductions for their in-kind crop transfers to the CRATs.  On each return they reported interest income from the SPIA as shown on the Form 1099–R issued to the trustee.  But they did not report the balance of the annuity distributions, taking the position that these payments constituted a nontaxable return of corpus under section 664(b)(4).

For 2015 and 2016 petitioner husband filed Forms 709, United States Gift (and Generation-Skipping Transfer) Tax Return.  On the 2015 return he reported that petitioners had contributed to CRAT I corn and soybeans with a fair market value (FMV) of $469,003 and a cost basis of zero.  On the 2016 return he reported that petitioners had contributed to CRAT II corn and soybeans with an FMV of $666,975 and a cost basis of zero.

---

[2] For purposes of this litigation respondent has not challenged the validity of CRAT I or CRAT II.

**[\*4]**    For each year the trustee filed for each CRAT a Form 5227, Split-Interest Trust Information Return.  The trustee attached to each of the 2015 and 2016 information returns a Form 4797, Sales of Business Property, reporting sale of the crops contributed by petitioners.  For 2015 he reported that CRAT I had received proceeds of $469,003 from sale of crops with a basis of $471,000, for a loss of $1,997.  For 2016 he reported that CRAT II had received proceeds of $691,827 from sale of crops with a basis of $666,975, for a gain of $24,852.

The IRS selected petitioners' 2015–2017 income tax returns for examination.  It determined that their characterization of the SPIA distributions as nontaxable returns of corpus under section 664(b)(4) was improper.  Rather, the examining agent concluded that these distributions represented proceeds from the sale of petitioners' corn and soybeans and as such were taxable to them as ordinary income.  The IRS accordingly increased their Schedule F farm income by $83,440 in 2015 and by $206,967 in 2016 and 2017.[3]

During the examination petitioners contended that they had neglected to claim on their 2015 and 2016 returns, but should be allowed, noncash charitable contribution deductions for portions of their donations to the CRATs.  In petitioners' view, the allowable deduction for each year was equal to the proportion of the FMV of the donated crops that was destined to the charitable remaindermen.  Petitioners had not secured an appraisal for either donation or attached a Form 8283, Noncash Charitable Contributions, to their 2015 or 2016 income tax return.  The examining agent nevertheless agreed with their position and allowed additional charitable contribution deductions of $67,788 for 2015 and $106,413 for 2016.[4]

The IRS issued petitioners a timely notice of deficiency determining deficiencies of $55,040, $56,904, and $95,907 for 2015–2017, respectively, plus accuracy-related penalties.  The IRS has conceded the

---

[3] The Schedule F adjustments are approximately equal to the annuity distributions petitioners received—$84,368 in 2015 and $209,289 ($84,368 + $124,921) in 2016 and 2017—minus the interest they reported as taxable. (Respondent represents that the adjustments involve a small math error in petitioners' favor.)

[4] There is a discrepancy between the amounts allowed by the examining agent as charitable contribution deductions and the amounts distributed by the CRATs to the charitable remainderman.  The record suggests that the examining agent employed a "time value calculation" to compute the deductions, but the record does not disclose what formula the examining agent employed.  Because we hold that no deductions are allowable, we need not resolve this discrepancy.

[*5] penalties for inability to show timely supervisory approval. *See* § 6751(b)(1). On November 22, 2021, we granted respondent's Motion for Leave to Amend Answer to disallow the noncash charitable contribution deductions that the examining agent had allowed for 2015 and 2016.

On January 28, 2022, respondent filed a Motion for Partial Summary Judgment, to which petitioners timely replied. On November 1, 2021, and April 11, 2022, the parties filed Stipulations of Settled Issues that resolve all issues in this case apart from the two issues presented by respondent's summary judgment motion. Those issues are: (1) whether petitioners are entitled to noncash charitable contribution deductions for 2015 and 2016, and (2) whether the annuity distributions were taxable to petitioners as ordinary income in 2015–2017.

## Discussion

### A. *Summary Judgment Standard*

The purpose of summary judgment is to expedite litigation and avoid costly, unnecessary, and time-consuming trials. *See FPL Grp., Inc. & Subs. v. Commissioner*, 116 T.C. 73, 74 (2001). We may grant summary judgment regarding an issue as to which there is no genuine dispute of material fact and a decision may be rendered as a matter of law. Rule 121(b); *Sundstrand Corp.*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994). Petitioners have alleged no genuine dispute of material fact affecting the questions that respondent has proposed for summary judgment. We conclude that these questions may appropriately be adjudicated summarily.

### B. *Charitable Contribution Deductions*

During the examination petitioners raised, as an affirmative issue, their alleged entitlement to noncash charitable contribution deductions for portions of the crops they transferred to the CRATs. The examining agent allowed such deductions. By timely amended answer, respondent contends that the examining agent erred and that these deductions should be disallowed. Because this is a "new matter," respondent bears the burden of proof on this point. *See* Rule 142(a)(1). We conclude that respondent has carried his burden and that the deductions are impermissible.

**[\*6]**   1.   *Substantiation*

Income tax deductions are a "matter of legislative grace." *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992).  Charitable contribution deductions may be allowable for transfers to a CRAT, corresponding to the value of the charitable remainder interest.  *See* § 170(f)(2)(A); Treas. Reg. § 1.170A-6(b).  However, as is true for any other deduction, charitable contribution deductions are permitted "only if verified under regulations prescribed by the Secretary."  § 170(a)(1).

The Code imposes strict substantiation requirements for noncash gifts, especially where the claimed value of the contribution exceeds $5,000.  For gifts of property (other than publicly traded securities) valued in excess of $5,000, the taxpayer generally must (1) obtain a qualified appraisal of the property and (2) attach to the return on which the deduction is claimed a fully completed appraisal summary on Form 8283.  *See* § 170(f)(11)(C); *Oakhill Woods, LLC v. Commissioner*, T.C. Memo. 2020-24, 119 T.C.M. (CCH) 1144, 1147.  A "qualified appraisal" must be prepared by a "qualified appraiser" no later than the due date of the return, including extensions.  *See* § 170(f)(11)(E); Treas. Reg. § 1.170A-13(c)(3).  The taxpayer must also maintain records substantiating the deduction.  *See* Treas. Reg. § 1.170A-13(b)(2)(ii)(D) (mandating written records demonstrating the FMV of the property, the methodology used to determine the FMV, and a copy of the signed report of an appraiser where applicable).

Petitioners did not satisfy (and do not contend that they satisfied) these substantiation requirements.  At no time did they secure an appraisal—"qualified" or otherwise—of the crops they transferred to the CRATs.  They did not attach to their 2015 or 2016 return a completed Form 8283 substantiating the gifts.  And they did not maintain the written records required by the regulations.

Deductions are allowable for charitable gifts "only if verified under regulations prescribed by the Secretary."  § 170(a)(1).  "[N]o deduction shall be allowed" for gifts of property described in section 170(f)(11) unless its strict substantiation requirements are met.  *See* § 170(f)(11)(A)(i).  Because petitioners failed to satisfy these requirements, they are not entitled to any noncash charitable contribution deductions.[5]

---

[5] Section 170(f)(11) may not operate to deny a deduction "if it is shown that the failure to meet [its] requirements is due to reasonable cause and not to willful neglect."

**[\*7]** 2.    *Application of Section 170(e)(1)*

Even if petitioners had complied with the statutory substantiation requirements, they would not be entitled to charitable contribution deductions for donating to the CRATs bushels of soybeans and corn, which were ordinary income property in their hands.    Section 170(e)(1)(A) provides that the deduction otherwise allowable for a contribution of property shall be reduced by "the amount of gain which would not have been long-term capital gain . . . if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution)."

Inventory held primarily for sale to customers in the regular course of a trade or business is ordinary income property.  No portion of the gain from the sale of such property could be long-term capital gain. § 1221(a)(1).  Thus, the deduction for a contribution of ordinary income property is typically limited to the donor's cost basis in the property. *See Jones v. Commissioner*, 560 F.3d 1196, 1199 (10th Cir. 2009), *aff'g* 129 T.C. 146 (2007); *Strasburg v. Commissioner*, T.C. Memo. 2000-94, 79 T.C.M. (CCH) 1697, 1704 ("The allowable charitable contribution deduction for ordinary income property is limited to the basis of the property donated.")  Accordingly, if a taxpayer has zero basis in ordinary income property, section 170(e)(1)(A) "require[s] that the deduction for donating that property be reduced by the property's entire value—leaving the taxpayer with no deduction at all." *Jones v. Commissioner*, 560 F.3d at 1199; *see Lary v. United States*, 787 F.2d 1538, 1540–41 (11th Cir. 1986); *Conner v. Commissioner*, T.C. Memo. 2018-6, 115 T.C.M. (CCH) 1013, 1023, *aff'd*, 770 F. App'x 1016 (11th Cir. 2019).

Petitioners were engaged in the farming business, and the corn and soybeans grown on their farm constituted ordinary income property. Thus, any charitable contribution deduction would be limited to their cost or adjusted basis in the crops. *See Jones v. Commissioner*, 560 F.3d at 1199.  As petitioner husband conceded when filing the 2015 and 2016 gift tax returns, petitioners' basis in the corn and soybeans transferred to the CRATs was zero. *See supra* p. 3.  That was because petitioners had fully expensed, on their 2015 and 2016 income tax returns, all the costs of growing the crops. *See supra* p. 3.  In order to have a basis in the donated crops, petitioners would have had to incur, with respect to

---

§ 170(f)(11)(A)(ii)(II).  Petitioners do not contend that they could make this showing, and they have advanced no argument to this effect in their response to the summary judgment motion.

[*8] those crops, farming expenses in addition to those deducted on their 2015 and 2016 income tax returns. They do not allege that they incurred any such additional farming expenses. Accordingly, the available deduction for the transfers of corn and soybeans to the CRATs is reduced to zero under section 170(e)(1)(A).

C.    *Taxability of CRAT Distributions*

1.    *Governing Statutory Structure*

A CRAT is a type of charitable remainder trust (CRT). In general, a CRT provides for annual distributions to the grantor (or other non-charitable life beneficiaries) and an irrevocable remainder interest designated for one or more qualified charities. *See* § 664; Treas. Reg. § 1.664-1(a). A trust is a CRT only if it is a CRAT or a charitable unitrust. *See* Treas. Reg. § 1.664-1(a)(2).

As a rule, no gain is recognized by the donor upon transfer of appreciated property to a CRT. *See Buehner v. Commissioner*, 65 T.C. 723, 740 (1976) ("A gift of appreciated property [to a CRT] does not result in income to the donor . . . ." (quoting *Humacid Co. v. Commissioner*, 42 T.C. 894, 913 (1964))). And because CRTs are exempt from income tax, appreciated property can be sold by the trust tax free. *See* § 664(c)(1); Treas. Reg. § 1.664-1(a)(1)(i). However, notwithstanding a CRT's tax-exempt status, the income earned by the trust is taxable to its income beneficiaries upon distribution. *See Alpha I, L.P. v. United States*, 682 F.3d 1009, 1015 (Fed. Cir. 2012) (citing section 664(b) and (c)(1)).

Congress has set forth specific ordering rules that govern the characterization and reporting of annuity amounts distributed by a CRAT to its income beneficiaries. *See* § 664(b).[6] Under this regime, distributions from a CRAT to income beneficiaries are deemed to have the following character, and to be distributed in the following order: first, as ordinary income, to the extent of the trust's current and previously undistributed ordinary income; second, as capital gain, to the extent of the trust's current and previously undistributed capital gain; third, as other income, to the extent of the trust's current and previously undistributed other income; and fourth, as a nontaxable distribution of trust corpus. § 664(b)(1)–(4).

---

[6] The ordering rules specified in section 664(b) supersede the general rules set forth in subchapter J, sections 652 and 662, for income taxation of estates, trusts, and beneficiaries.

**[*9]**   We have previously discussed the application of section 664(b) and the treatment of CRAT distributions. *See Miller v. Commissioner*, T.C. Memo. 2009-182, 98 T.C.M. (CCH) 87. A distribution from a CRAT is deemed to consist first of income that is subject to the highest Federal tax rate (ordinary income), and then, upon exhaustion of that class, of income subject to progressively lower tax rates. Only after all taxable income has been distributed is a beneficiary deemed to receive a nontaxable return of corpus. *See id.* at 88–89.

CRATs are subject to strict reporting requirements to ensure compliance with the statutory ordering rules. *See* § 4947(a)(2); Treas. Reg. § 1.664-1(a)(1)(ii). A CRAT must file an annual information return on Form 5227 reflecting its income, deductions, accumulations, and distributions for the year. *See* § 6011; Treas. Reg. § 53.6011-1(d). It must issue to each income beneficiary a Schedule K–1, Beneficiary's Share of Income, Deductions, Credits, etc., properly describing the tax character of all distributions. *See* § 6034(a); Treas. Reg. § 1.6012-3(a)(6). And it must maintain a record of the basis of all property contributed to it. *See* § 1015(a).

### 2.   *Analysis*

As petitioner husband conceded when filing the 2015 and 2016 gift tax returns, petitioners' basis in the corn and soybeans transferred to the CRATs was zero. That was because petitioners had fully expensed, on their 2015 and 2016 income tax returns, all the costs of growing the crops. *See supra* p. 7.

Section 1015 provides that, if property is transferred (in trust or otherwise) by gift, "the basis shall be the same as it would be in the hands of the donor," increased by any gift tax paid on the transfer. *See* § 1015(a), (d). The transferee acquires an FMV basis only if the donor's basis was "greater than the fair market value of the property at the time of the gift." § 1015(a). Section 1015(a) applies to property "acquired by gift after December 31, 1920." These basic tax principles have thus been established for a very long time. *See Veterans Found. v. Commissioner*, 38 T.C. 66, 72 (1962), *aff'd*, 317 F.2d 456 (10th Cir. 1963); *Magness v. Commissioner*, T.C. Memo. 1965-260, 24 T.C.M. (CCH) 1413.

Petitioners did not pay any gift tax upon transfer of the crops to the CRATs. Under section 1015(a), each CRAT thus acquired a basis of zero in the corn and soybeans, the same basis that the crops had in petitioners' hands. The FMV of the transferred crops is irrelevant in

[*10] determining the CRATs' basis because petitioners' basis was *lower* than the FMV of the crops. *See* § 1015(a).

CRAT I and CRAT II sold the corn and soybeans transferred to them for $469,003 and $691,827, respectively. Because each CRAT had a basis of zero in the crops, they realized profits of $469,003 and $691,827, respectively, on those sales. *See* § 1001. The corn and soybeans were ordinary income property in petitioners' hands. *See* § 1221(a)(1) (defining "capital asset" to exclude "property of a kind which would properly be included in inventory of the taxpayer"). The crop sales were effected in the ordinary course of business by Co-Alliance LLP, in whose grain elevators the crops had been stored. In responding to the Motion for Partial Summary Judgment, petitioners do not contend that the corn and soybeans were capital assets in the hands of the CRATs.[7]

CRAT I and CRAT II thus realized ordinary income of $469,003 and $691,827, respectively, upon sale of the crops, just as petitioners would have done if they had sold the crops themselves. Under the statutory ordering rules, annuity amounts distributed by a CRAT to its life beneficiaries are treated first as ordinary income, to the extent of the CRAT's ordinary income. *See* § 664(b)(1). All ordinary income must be distributed before any other category of income, including nontaxable return of corpus, can be deemed to be distributed. *See Miller*, 98 T.C.M. (CCH) at 88–89. Accordingly, the annuity distributions of $83,440, $206,967, and $206,967 for taxable years 2015, 2016, and 2017, respectively, are characterized as ordinary income to petitioners.

### 3. *Petitioners' Arguments*

Petitioners' response to the summary judgment motion is not a model of clarity. As best we can tell, they appear to make three arguments. None has merit.

#### a. *Stepped-Up Basis*

Petitioners advance two theories to support the proposition that the CRATs acquired a stepped-up basis, rather than a zero basis, in the

---

[7] Even if the corn and soybeans were considered capital assets in the CRATs' hands, the CRATs sold the crops a few months after receiving them. The gains realized by the CRATs would thus be short-term capital gains taxable at ordinary income rates. *See* § 1222(3) (defining "long-term capital gain" as "gain from the sale or exchange of a capital asset held for more than 1 year"). Any short-term capital gain is taxed as ordinary income. *See* §§ 1(a), (h)(1), 1222(1) (defining short-term capital gain).

[*11] corn and soybeans. First, they contend that they *sold* the crops to the CRATS, so that the CRATs acquired a "cost basis" under section 1012. This argument does not pass the straight-face test. As evidenced by the filing of gift tax returns, petitioners *contributed* the crops to the CRATs. There is no evidence that the CRATs, which had no assets before the crops were transferred to them, paid any consideration that could give rise to a "sale or exchange." *See* § 1222. And if petitioners had sold the crops to the CRATs, they would have had to report additional farming income on their Schedules F for 2015 and 2016, which they did not do.

Equally unpersuasive is petitioners' reliance on the Forms 4797 attached to the CRATs' information returns. These forms, prepared by petitioners' son as trustee, reported that CRAT I had received proceeds of $469,003 from sale of crops with a basis of $471,000, for a loss of $1,997, and that CRAT II had received proceeds of $691,827 from sale of crops with a basis of $666,975, for a gain of $24,852. Petitioners have supplied no factual support for the basis numbers reported by the trustee, and those numbers are utterly implausible. As noted earlier, the corn and soybeans had a basis of zero when the CRATs acquired them. Petitioners offer no explanation as to how the CRATs' basis could have been adjusted upward, by more than $1 million in the aggregate, during the brief period in which the CRATs held the crops before selling them.

b.     *Nontaxable Distribution*

Section 664(c)(1) provides that a CRAT "shall, for any taxable year, not be subject to any tax imposed by this subtitle." Citing the "plain language" of this provision, petitioners assert that a CRAT's distributions to life beneficiaries must *also* be exempt from tax. In essence, petitioners contend that all distributions from a CRAT constitute nontaxable returns of corpus, because Congress supposedly intended that "[t]he donor's beneficiaries and the charity benefit rather than the Service."

Petitioners cite no legal authority to support their position, and there is none. Section 664(c), captioned "Taxation of Trusts," provides that the CRAT itself is exempt from tax. Petitioners ignore section 664(b), which specifies the taxability and character of amounts distributed by a CRAT "in the hands of the beneficiary to whom is paid the annuity." Section 664(b)(1) mandates that annuity amounts distributed to life beneficiaries are taxable as ordinary income "to the extent of such income of the trust." As discussed previously, the CRATs received

**[\*12]** ordinary income of $469,003 and $691,827, respectively, from sale of the donated crops. *See supra* p. 10. The distributions to petitioners did not exceed those amounts, and those distributions were thus taxable in full as ordinary income.

Petitioners argue that they "should not be double taxed on income from the sale of the asset and then taxed on the annuity proceeds purchased from the sale of the assets." No double taxation exists: Petitioners paid no tax when transferring appreciated crops to the CRATs, and the CRATs paid no tax on their gain from selling the crops. There is a *single* level of taxation, expressly mandated by section 664(b)(1), when proceeds from sale of the crops are distributed to petitioners. Petitioners seek to avoid any taxation whatever of the income generated by the sale of their ordinary income property. The Code does not permit that result.

c.     *Taxation of Annuities Under Section 72*

Lastly, petitioners contend that distributions from the SPIAs should be taxed under section 72, which sets forth general rules for the taxation of annuities. Section 72(b)(1) generally provides that taxable income excludes any amount received as an annuity "which bears the same ratio to such amount as the investment in the contract . . . bears to the expected return under the contract."

For at least two reasons petitioners err in relying on the general annuity rules. First, these rules apply "[e]xcept as otherwise provided in this chapter," viz., in chapter 1, governing normal taxes and surtaxes. *See* § 72(a)(1). Section 664(b), a provision within chapter 1, specifies distinct rules applicable to annuity distributions from CRATs. Thus, to the extent sections 72 and 664 called for different treatment, section 664 would control.

Second, section 72 does not call for different treatment. Section 72(b)(1) allows an exclusion from income only to the extent the taxpayer has an "investment in the contract." Neither petitioners nor the CRATs had any investment in the annuity contracts. *See* § 72(c)(1). That is because both contracts were purchased with proceeds from the sale of agricultural crops that had a basis of zero.

To implement the foregoing,

*An appropriate order will be issued, and decision will be entered under Rule 155.*